SAUL S. PEARL and DOROTHY PEARL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent PEARL EQUIPMENT COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pearl v. Commissioner
Docket Nos. 2518-75, 2519-75.
United States Tax Court
T.C. Memo 1977-262; 1977 Tax Ct. Memo LEXIS 174; 36 T.C.M. (CCH) 1059; T.C.M. (RIA) 770262; August 11, 1977, Filed William Waller,J. T. O'Hara, and Lawrence Dortch, for the petitioners. Richard J. Neubauer, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: In these consolidated proceedings, respondent determined the following income tax deficiencies and additions to tax under section 6653(a): [1]/ Docket No. 2518-75--Saul S. Pearl, et ux.
Penalty Calendar Year
Deficiency
(sec. 6653(a))
1970
$71,887.31
0
Docket No. 2519-75--Pearl Equipment Company, Inc.
Taxable
Year Ended
3/31/68
$ 8,707.73
$ 435.39
3/31/71
$ 46,016.88
$2,300.84
3/31/72
$169,456.22
$8,472.81
*175 By amendment to his answer filed on September 14, 1976, in docket No. 2519-75, respondent alleged there were additional deficiencies for the taxable years ended March 31, 1971, and March 31, 1972, and additions to tax, bringing the totals to the following amounts: Taxable
Penalty Year Ended
Deficiency
(sec. 6653(a))
3/31/71
$ 51,557.09
$2,577.85
3/31/72
$176,944.22
$8,847.21
Four issues are presented for our decision: 1. Whether petitioner Pearl Equipment Co., Inc., overstated its cost of goods sold in the amounts of $129,893.29 and $336,390.72 for its taxable years ended March 31, 1971, and March 31, 1972, respectively, as a result of the write-down of items of its inventory of used equipment and machinery to what purported to be the market value of such items. 2. Whether rent at a rate in excess of $50,400 per year paid by petitioner Pearl Equipment Company, Inc., for its taxable years ended March 31, 1971, and March 31, 1972, is deductible as ordinary business expenses for the continued use *176 of its business premises. 3. Whether petitioner Saul S. Pearl received and failed to report dividend income of $107,005.23 during the calendar year 1970. 4. Whether petitioner Pearl Equipment Company, Inc., is liable for the 5-percent negligence penalty imposed by section 6653(a) for its taxable years ended March 31, 1968, March 31, 1971, and March 31, 1972.
FINDINGS OF FACT General
Petitioners Saul S. Pearl (hereinafter Pearl) and Dorothy Pearl, husband and wife, were legal residents of Nashville, Tennessee, at the time their petition was filed. Pearl and his wife filed a joint Federal income tax return for 1970 with the Southeast Service Center, Chamblee, Georgia. Petitioner Pearl Equipment Company, Inc. (hereinafter petitioner) is a Tennessee corporation which, at the time its petition was filed, maintained its principal place of business in Nashville, Tennessee. During the years in issue, petitioner reported its income on the basis of a fiscal year ending March 31, using the accrual method of accounting. At all relevant times, Pearl owned 94 percent of petitioner's outstanding stock and Harvey S. Eisen (Eisen) owned the remaining 6 percent. Petitioner's *177 business consisted primarily of buying and selling new and used manufacturing machinery and equipment. Petitioner also leased new and used equipment and machinery. Petitioner maintained a sales office, storage space, and a reconditioning plant in Nashville, Tennessee, and a warehouse in Chicago, Illinois. Petitioner also maintained sales offices in major cities in the United States and had the controlling interest in a Canadian corporation which carried on the same business activities in Canada as those of petitioner in the United States. Issue 1. Inventory
During the years in issue, petitioner maintained its inventory of used equipment employing the lower of cost or market accounting system. Petitioner purchased used machinery when it became available in the market and such availability depended on factors over which petitioner had no control. Most of petitioner's used machinery was purchased from the United States Government and large industrial users. In order to sell used machinery, petitioner was often required to recondition it. Generally, this reconditioning work was undertaken when a prospective customer bought, or indicated an interest in buying, an item. *178 Prior to the fiscal year ended March 31, 1972, reconditioning costs were not reflected in the inventory cost of the individual machine. Beginning with its fiscal year ended March 31, 1972, and continuing in subsequent years, petitioner allocated refurbishing costs to the particular machine involved and reflected such costs in its inventory records. At the time used machinery was purchased, petitioner hoped to resell it promptly but frequently did not do so. The following schedule reflects the number of used machines purchased during the fiscal years ended March 31, 1971, 1972, and 1973, and the number of those machines resold during the year of purchase: FYE
FYE
FYE
3/31/71
3/31/72
3/31/73
Used machines
purchased
407
264
453
Used machines
sold during year
of purchase
85
55
141
Percentage of
sales in year
of purchase
20.88
20.83
31.13
The items of used machinery not sold during the year of purchase remained in petitioner's inventory for varying lengths of time. The following schedule reflects, as of March 31, 1972, and March 31, 1973, the number of new and used machines on hand and the length of time they had been carried in *179 petitioner's inventory: March 31, 1972
Number of
Machines
Percentage
Less than 1 year
207
26
Over 1 but less than 2 years
210
26
Over 2 but less than 3 years
133
17
Over 3 but less than 4 years
62
8
Over 4 years
190
23
Total
802
100
Total over 1 year
595
74
Total over 2 years
385
42
March 31, 1973
Less than 1 year
326
36
Over 1 but less than 2 years
130
14
Over 2 but less than 3 years
142
16
Over 3 but less than 4 years
111
12
Over 4 but less than 5 years
52
5
Over 5 years
155
17
Total
916
100
Total over 1 year
590
64
Total over 2 years
460
50
Prior to the years here in controversy and continuing through them, petitioner followed a practice of writing down the inventory value of individual items of machinery from cost to what petitioner allegedly considered their "market" value. A committee composed of Pearl, Eisen, and two members of petitioner's accounting and financial staff selected the items of machinery to be written down and determined the value to be assigned to such items. This committee purportedly took into account current market conditions, obsolescence, and mistakes of judgment in *180 purchasing the various items. In arriving at the individual asset values, the committee considered information, records, and market data maintained in petitioner's library. No specific formula was used by the committee in writing down the items of used machinery, and a reduction in inventory was not necessarily accompanied by a reduction in the asking price for the particular machine. In an examination of petitioner's Federal income tax return for the fiscal year ended March 31, 1970, petitioner and the examining revenue agents agreed that the book values of 137 items of machinery and equipment, as written down by petitioner, should be increased by 27 percent to arrive at their March 31, 1970, ending inventory value for that fiscal year. Petitioner, however, did not record in its books the agreed upon 27-percent increase in inventory values for these assets. Such machines remaining in petitioner's inventory on March 31, 1971, and March 31, 1972, respectively, were carried at values fixed by petitioner without regard to the agreement between the examining revenue agents and petitioner, except that petitioner wrote down some of the items still further as of the close of each of *181 the fiscal years ended March 31, 1971, and March 31, 1972.
At the close of its fiscal year ended March 31, 1971, petitioner had 758 used machines in its inventory. Of this number, the inventory value of 400 machines were marked down by petitioner during that fiscal year or during earlier years. At the close of its fiscal year ended March 31, 1972, petitioner's total inventory of used machines was 802. Of this number, 469 machines were written down during that fiscal year or during earlier years. In determining the contested deficiencies for the fiscal years ended March 31, 1971, and March 31, 1972, respondent wrote back to the value as adjusted as of March 31, 1970, the items which were the subject of the agreement referred to above. In addition, respondent wrote back to actual cost the machines which petitioner acquired during the fiscal years ended March 31, 1971, and March 31, 1972, and had written down. The number of machines thus placed in controversy was approximately 380. In valuing petitioner's inventory of used machinery and equipment, respondent increased the ending inventory value of the approximately 380 items in controversy for the fiscal years ended March 31, 1971, and *182 March 31, 1972, in the amounts of $129,893.29 and $466,284.01, respectively, as follows: 3/31/71
3/31/72
Cost determined
by respondent [1]/
$324,794.79
$637,646.01
Inventory per books
194,901.50
171,362.00
Adjustment
$129,893.29
$466,284.01
A corresponding decrease in cost of goods sold and an increase in taxable income of $129,893.29 for petitioner's fiscal year ended March 31, 1971, and $336,390.72 for the fiscal year ended March 31, 1972, resulted from respondent's adjustments. Of the 380 items in dispute, 340 items were still in petitioner's inventory as of March 31, 1972. Of these 340 items, all but 99 were marked down to their scrap value. The following table shows the values assigned to them: No. of items written down to $0
15
No. of items written down to $2
1
No. of items written down to $64
1
No. of items written down to $75
1
No. of items written down to $5, $10, $25, $50, and $100
223
Total items written down to scrap
241
No. of other items written down
but not to scrap
99
Total
340
*183 During the fiscal years ended March 31, 1971, and March 31, 1972, petitioner sold over 181 items of used machinery for amounts exceeding their acquisition costs and, in each such sale, the sale price exceeded the inventory value assigned to each such machine. Although petitioner wrote down approximately 241 items to scrap values of $100 or less as of March 31, 1972, only three items of machinery were actually disposed of asscrap during the March 31, 1971, and March 31, 1972, fiscal years. Of the 223 items marked down to scrap values of $5, $10, $25, $50, and $100, 94 items were later sold. The following table shows the book inventory value (i.e., the values assigned by petitioner) of the 223 items and the total sales price of the 94 items: Write-Downs to Scrap
3/31/72
No. Items
Total Scrap
No.
Book
Sold
Sales Value
Items
Inventory
Later
Price
$ 5.00
14
$ 70.00
4
$ 41,362.50
10.00
38
380.00
17
72,549.37
25.00
17
425.00
11
34,800.00
50.00
80
4,000.00
37
164,847.50
100.00
74
7,400.00
25
164,282.50
223
$12,275.00
94
$477,841.87
Of the 99 items of machinery written down to values in excess of *184 scrap values, 74 items, which cost a total of $441,809.21, were sold for a total of $971,720.01. Less than 10 percent of those 74 items were sold at less than cost (but still as much or more than the value at which they were included in petitioner's March 31, 1972, inventory). The following table lists 22 transactions in which machines were sold for less than their cost but more than the marked-down inventory values: Actual
Inventory Stock
Date
Cost as of
Sales
Date
Per Books No.
Acquired
3/31/72 [1]/
Price
of Sale
3/31/72 [2]/
Used Machines
1203
2/27/67
$7,396.60
$4,000.00
4/11/72
$ 196.00
1405
5/ 3/67
3,469.00
2,500.00
5/ 4/73
25.00
1589
12/21/67
5,658.40
4,500.00
10/ 8/73
100.00
1591
12/21/67
5,600.00
4,500.00
10/ 8/73
100.00
1595
12/21/67
5,600.00
2,000.00
4/30/71
25.00
1728
3/29/68
308.00
250.00
2/22/72
5.00
2084
5/ 5/69
768.88
750.00
3/14/73
177.00
2306
2/ 9/70
669.00
500.00
6/28/73
50.00
2334
3/ 3/70
1,429.00
1,150.00
2/25/72
579.00
Used Welders
2072
4/21/69
1,000.00
900.00
4/11/75
100.00
Other Inventory
P2013
1/27/69
8,364.50
2,500.00
11/ 2/73
1,500.00
P2467
3/31/71
1,000.00)
100.00
P2468
3/31/71
1,000.00) 100.00
P2469
3/31/71
1,000.00)
1,225.00
2/28/72
100.00
P2470
3/31/71
1,000.00)
100.00
P2471
3/31/71
1,000. 00)
100.00
P2492
3/31/71
1,000.00)
100.00
P2475
3/31/71
3,088.95
2,750.00
8/18/72
519.00
P2570
3/31/71
629.05
600.00
10/ 4/71
100.00
P2769
3/31/71
1,409.07
400.00
9/27/73
229.00
P2773
3/31/71
1,232.93
207.75
5/18/73
200.00
P2775
3/31/71
1,660.68
964.25
12/26/73
269.00
Totals
$54,284.06
$29,697.00
$4,774.00
*185 Issue 2. Rent
At all relevant times, petitioner's office and plant facilities were owned by Doran Properties (hereinafter Doran), a joint venture in which 75-percent interest was owned by Pearl and 25-percent interest by Eisen. On January 2, 1966, petitioner entered into a lease with Doran for the office and plant facilities for a period of 5 years beginning January 1, 1966, and ending December 31, 1970. The leased building contained 68,000 square feet of plant space and 10,000 square feet of office space. Pearl signed the lease on behalf of petitioner and both Pearl and Eisen signed it on behalf of Doran. The lease provided in pertinent part as follows: 1. Lessee shall pay to Lessor the sum of Forty Two Hundred ($4200.00) Dollars per month, payable in advance, with execution of this agreement and a like sum on the first day of each succeeding month during the full term. * * *
10. Lessee shall have, at the expiration of this lease, an option to lease the described premises for an *186 additional five (5) years upon the same terms and conditions. If lessee exercises this option and leases the property for a second term of five years, then Lessee shall have a second option of like character. In the case of each of these options herein granted, Lessee shall notify Lessor at least six (6) months prior to the expiration of the current lease whether or not Lessee will exercise the option available. On June 1, 1970, petitioner's board of directors authorized negotiations with Doran to secure a new lease. On January 1, 1971, petitioner entered into a new lease with Doran for the office and plant facilities. The lease was identical with the expired lease, except that the lease term was for 5 years from January 1, 1971, until December 31, 1975, and monthly rentals of $8,000 instead of the previous rental of $4,200 per month were prescribed. From April 1970 through March 1972, inclusive, petitioner paid Doran the amounts provided in the leases--$4,200 per month for the months of April 1970 through December 1970, and $8,000 per month for the months of January 1971 through March 1972. Those amounts, totaling $61,800 and $96,000 for the taxable years ended March 31, 1971, and *187 March 31, 1972, respectively, were claimed as rent expense deductions in petitioner's Federal income tax returns. In his notice of deficiency, respondent did not disallow any of the rent deduction claimed for the taxable year ended March 31, 1971, but made the following determination in respect of the next year: It is determined that the rent expense of $96,000, claimed on your income tax return for the taxable year ended March 31, 1972, as paid to Doran Properties, a partnership owned solely by your corporate shareholders, for rental of your plant is excessive to the extent of $30,000.00. Accordingly, taxable income for the taxable year ended March 31, 1972, is increased by $30,000.00. By an amendment to his answer, respondent alleged that petitioner is not entitled to deduct more than $50,400 per year as rent for the plant owned by Doran and that petitioner paid excessive rent, which should be disallowed as deductions in the amounts of $11,400 and $45,600 in its taxable years ended March 31, 1971, and March 31, 1972, respectively. On this ground respondent alleges that the additional deficiencies referred to above are due and owing. Issue 3. Constructive Dividend
*188 From April 1, 1970, through December 31, 1970, Pearl periodically withdrew from petitioner amounts totaling $108,310.95. These withdrawals were charged on petitioner's books as "Accounts Receivable--Officers." The amounts withdrawn were used by Pearl to invest in securities for his personal use. During that same period, $1,305.72 was credited to the "Accounts Receivable--Officers" ledger leaving a net withdrawal during the 1970 calendar year of $107,005.23. [2]/ As of April 1, 1970, the balance in the accounts receivable ledger was $41,468.05 which, with the net withdrawals of $107,005.23, left a total balance of $148,473.28 as of December 31, 1970. For the balance of petitioner's fiscal year ended March 31, 1971, $7,251.21 was charged to the account, leaving a balance of $155,724.49 as of the close of petitioner's fiscal year. On March 31, 1971, Pearl executed a note for $150,000 payable to petitioner. On petitioner's *189 books, the $150,000 was credited to the "Accounts Receivable--Officers" ledger, leaving a balance owing by Pearl of $5,724.49, and $150,000 was charged to "Notes Receivable." During the fiscal years ended March 31, 1972, and March 31, 1973, the "Accounts Receivable--Officers" ledger was charged and credited with various amounts, leaving a balance as of September 30, 1972, of $12,851.94. As of September 30, 1972, petitioner's "Notes Receivable" account had a balance of $177,000, representing $9,000 due from Doran, and $168,000 due from Pearl. Pearl intended at all times to repay the amounts owed to petitioner and he eventually did so. On his personal financial statement submitted to local banks, Pearl listed $150,000 as a liability owed to petitioner. Through its fiscal year ended March 31, 1972, petitioner had never paid dividends to its shareholders. Respondent determined that the $107,005.23 net withdrawals by Pearl during the 1970 calendar year were actually dividends to Pearl and taxable as such. OPINION Issue 1. Inventory
Section 471 provides that-- inventories *190 shall be taken by * * * [the] taxapayer on such basis as the Secretary or his delegate may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income. Pursuant to this authorization, the Secretary has prescribed detailed regulations on various methods of inventory accounting. The method employed by petitioner was "cost or market, whichever is lower." Under this method, "the market value of each article on hand at the inventory date" is "compared with the cost of the article, and the lower of such values" is "taken as the inventory value of the article." Sec. 1.471-4(c), Income Tax Regs.
Section 1.471-4(a), Income Tax Regs., provides generally that, under ordinary circumstances and for ordinary goods in an inventory, "market" means the "bid price" prevailing at the inventory date for the particular merchandise "in the volume * * * usually purchased by the taxpayer." Since petitioner purchases and sells only individual items or small lots of used machinery, *191 this general rule is inapplicable. The provisions of section 1.471-4(b), Income Tax Regs., deal with the situation where there is no open market or the market conditions are inactive as follows: (b) Where no open market exists or where quotations are nominal, due to inactive market conditions, the taxpayer must use such evidence of a fair market price at the date or dates nearest the inventory as may be available, such as specific purchases or sales by the taxpayer or others in reasonable volume and made in good faith, or compensation paid for cancellation of contracts for purchase commitments. Where the taxpayer in the regular course of business has offered for sale such merchandise at prices lower than the current price as above defined, the inventory may be valued at such prices less direct cost of disposition, and the correctness of such prices will be determined by reference to the actual sales of the taxpayer for a reasonable period before and after the date of the inventory. Prices which vary materially from the actual prices so ascertained will not be *192 accepted as reflecting the market. Petitioner maintains that its inventory mark-downs were made systematically on the basis of appraisals by experts in the used machinery business and that they represent the value of the various items of machinery. Petitioner further argues that, in making these markdowns, it followed "the best accounting practice" in the industry and that the mark-down procedure was consistently applied as contemplated by section 471. Respondent, on the other hand, argues that petitioner's periodic devaluations of its used machinery were "completely unfounded, arbitrary, and capricious" and did not reflect true inventory values. Respondent maintains that petitioner has not shown that the value of its machinery was less than cost (or less than the values to which the machinery was adjusted for the fiscal year ended March 31, 1970) and that, therefore, petitioner's inventory should be valued accordingly. We hold for respondent on this issue. We are not convinced that the marked-down inventory values claimed by petitioner reflect the market values of the various items of machinery. As detailed in our Findings, a committee of petitioner's employees assigned *193 values to individual pieces of equipment purportedly on the basis of their own judgments. In making their valuations, those employees did not use as their guide "specific purchases or sales by the taxpayer or others in reasonable volume" or "compensation paid for cancellation of contracts for purchase commitments" as contemplated by the first sentence of section 1.471-4(b), Income Tax Regs. Nor did the revised values assigned to individual items of machinery become the prices at which they were offered for sale, as contemplated by the second sentence of that regulation. And that regulation plainly states that: Prices which vary materially from the actual prices so ascertained will not be accepted as reflecting the market. As detailed in our Findings, petitioner continued to offer for sale and to sell its marked-down machinery at prices far in excess of the new inventory values. Only 3 of the 241 items marked down to scrap values were actually sold as scrap. Of items marked down to scrap, 94 pieces of machinery with an assigned total value of $12,275 were sold for $477,841.87. And 74 of the items written down to values greater than scrap, totaling *194 $441,809.21, were sold for $971,720.01. Indeed, petitioner sold some of its machines shortly after they were marked down for prices far in excess of the newly assigned inventory values. [3]/ We are not satisfied that the values assigned to the various items of machinery by petitioner's committee reflected their market value. Issue 2. Rent
*195 Section 162(a)(3) allows as a deduction: (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. Petitioner maintains that the phrase "terms and conditions" as used in paragraph 10, quoted in our Findings, of the January 2, 1966, lease between Doran and petitioner, was not intended to encompass the amount of rent to be paid. Petitioner contends that the parties intended from the beginning to review the rent at the end of each 5-year period and adjust it to a reasonable amount in the light of changed conditions. This contention is based in part on Eisen's testimony as follows: Q. Was any escalation clause considered? Any automatic escalation clause? A. We did not have an automatic escalation clause, as such.We realized at the time, in the initial five year period, that it was a very reasonable rate for Pearl Equipment Company, but we had just come from a much lower based rent area, and we didn't want to tax the company too greatly at that time, and we decided that we would give them a reasonable *196 rate and give them a chance to get off the ground in the new facilities, and then review it at the end of each five year period, and with the opportunity to put it at what should be -- what might be considered market value. Further, petitioner contends that the testimony shows that the $8,000 per month rental was reasonable during the period in issue and, therefore, should be allowed. Under the amendment to the answer, respondent contends that the January 2, 1966, lease gave petitioner an unqualified right of renewal at the same rental rate and argues that petitioner, therefore, should be allowed deductions only at the rate of $4,200 per month, citing Ray's Clothes, Inc. v. Commissioner, 22 T.C. 1332 (1954); Davis v. Commissioner, 26 T.C. 49 (1956); Consolidated Apparel Co. v. Commissioner, 17 T.C. 1570 (1952), revd. in part and affd. in part 207 F.2d 580 (7th Cir. 1953). To support this position, respondent maintains that, under a standard of arm's-length dealing, petitioner would have insisted on its right of renewal and that, therefore, no more than $4,200 per month was "required" to be paid "as a condition *197 to the continued use or possession" of the property. Yet the notice of deficiency disallowed none of the rent deduction of $61,800 claimed for the taxable year ended March 31, 1971, and only $30,000 of the $96,000 rent deduction claimed for the taxable year ended March 31, 1972. The determination was based on the ground that the disallowed amount was excessive, i.e., to the extent of the amount disallowed, the deduction exceeded a reasonable rental for the property. With the case in this posture, the burden of proof rests with respondent to show that petitioner may deduct only $4,200 per month as rent, i.e., that petitioner was legally entitled to renew the lease at that figure. The correctness of that conclusion depends upon the intention of the parties in signing the January 2, 1966, contract. The notice of deficiency determination and all the evidence as to the actual intention of the parties supports petitioner's position. In the circumstances, we think petitioners are entitled to deductions for the amount which was reasonable in the taxable year in controversy. Cf. Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694 (1977). After careful consideration *198 of all the evidence, we find that $66,000 per year was a reasonable rental for the property. The property cost approximately $580,000 in 1965, and a rental of $50,400 represented a return of 8.69 percent on a net lease basis. One of the expert witnesses testified the property had a value of approximately $775,000 in 1971 and 1972. An annual rental of 8.69 percent of this increased value would be in the range of $66,000.That is the amount of the deduction allowable. Issue 3. Constructive Dividend
Respondent contends that $107,005.23 withdrawn by Pearl from petitioner during 1970 represented dividends to him. Pearl, on the other hand, claims that the withdrawals were in fact loans and, therefore, not dividends. The determination of whether such withdrawals were loans or instead distributions taxable as dividends is a question of fact which turns on the circumstances surrounding the transaction. Al Goodman, Inc. v. Commissioner, 23 T.C. 288, 301 (1954); Shaken v. Commissioner, 21 T.C. 785, 792 (1954); White v. Commissioner, 17 T.C. 1562, 1568 (1952). *199 The critical factor is to determine whether the parties intended to create a bona fide loan at the time of the withdrawals. Electric & Neon. Inc. v. Commissioner, 56 T.C. 1324, 1338-1339 (1971), affd. per curiam 496 F.2d 876 (5th Cir. 1974). Close scrutiny is necessary when, as in the instant case, the individual who withdrew the funds controls the corporation from which the funds are withdrawn. Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. per curiam 422 F.2d 198 (5th Cir. 1970). The fact, however, that such individual is in control of the corporation is not necessarily determinative of the issue. Rather, we must determine whether the withdrawals in issue were in fact loans. Wiese v. Commissioner, 93 F.2d 921, 923 (8th Cir. 1938), affg. 35 B.T.A. 701 (1937), cert. denied 304 U.S. 562 (1938), rehearing denied 304 U.S. 589 (1938). We are convinced by the record that the withdrawals in question were always intended by the parties to be loans. Both Pearl and Eisner testified that the withdrawals were loans and were to be repaid by Pearl. Additionally, *200 Pearl testified that the withdrawals were all finally repaid to petitioner. Respondent failed to cross-examine Pearl on this point during trial, and this failure leads us to conclude that this testimony was accurate. Finally, Pearl's personal financial statement filed on July 31, 1971, with the Third National Bank of Nashville reflects a personal obligation owed by Pearl to petitioner in the amount of $150,000. Viewing all the facts, we conclude that Pearl at all times intended his withdrawals to be loans. In reaching this conclusion, we are mindful of Pearl's position as the dominant shareholder of petitioner and also of the fact that Pearl used the withdrawals for his personal use. However, the objective facts in support of our conclusion outweigh any evidence to the contrary. Accordingly, we hold that Pearl did not receive the determined dividend income in 1970. Issue 4. Negligence Penalty
Section 6653(a) provides that if any part of any underpayment is due to "negligence or intentional disregard of rules and regulations (but without intent to defraud)" there shall be added *201 to the tax an amount equal to 5 percent of the underpayment. Respondent determined additions to petitioner's tax for March 31, 1968, 1971, and 1972. He succinctly states the grounds for such determination as follows: In addition to the inventory write-downs during the taxable years ended March 31, 1971, and March 31, 1972, the petitioner also wrotedown its used machinery and equipment on hand at the end of the preceding year (the taxable year ended March 31, 1970). The respondent examined the return for that year and, as a result of the examination, the petitioner and the respondent agreed to increase the ending book inventory by 27 percent. However, the petitioner neglected or refused to record the 27 percent increase in its records, in consequence of which the petitioner ignored the effect of the agreement as it applied to those items of machinery and equipment that were also included in succeeding ending inventories, viz., March 31, 1971, and March 31, 1972. Additionally, petitioner's inventory practices constitute an intentional disregard of the statutes and regulations. Accordingly, the petitioner is subject to the negligence penalty for its capriciousness and intentional *202 disregard of rules and regulations. We cannot agree.We have been unable to locate any evidence in the record as to the date of the agreement by petitioner and respondent to increase the ending book inventory as of March 31, 1970, by 27 percent. However, petitioner's return for the taxable year ended March 31, 1968, shows that it was filed in June 1968. It is clear, therefore, that the agreement as to the taxable year 1970 was made after petitioner's books were closed and its return for the taxable year 1968 was filed. And we are not fully satisfied that such agreement was made in time to permit petitioner to record the 27-percent increase in its records for its taxable years ended March 31, 1971, and March 31, 1972. In any event, the deficiencies in issue could not have been "due" to petitioner's failure to increase by the agreed 27 percent the amount of the inventory value of the machines not sold during the taxable years ended March 31, 1971, and March 31, 1972. If the opening and closing inventory values of those machines not sold during such taxable years were the same, whether high or low, they would have no effect on taxable income. If the opening inventory value of *203 individual machines was not increased by the agreed 27 percent as of April 1, 1970, the beginning of the first fiscal year in dispute, and such machines were sold during a subsequent year in dispute, the taxable income in the year of sale would in fact have been increased by that amount. Only with respect to machines written down during the taxable years 1971 and 1972 and not sold during those years would petitioner's income for those years be decreased. Such write-downs would not be attributable to petitioner's neglect or refusal to record the agreed 27-percent increase in its records.And, although we have held such write-downs were erroneous, we do not think they were due to negligence or intentional disregard of the Commissioner's rules and regulations. Accordingly, petitioner is not liable for the determined section 6653(a) additions to tax. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.
1. /↩ I.e., the agreed inventory value as of Mar. 31, 1970, for machinery and equipment included in inventory as of that date, and the actual cost of machinery and equipment acquired during the taxable years ended Mar. 31, 1971, and Mar. 31, 1972.
1. / Or prior date of sale. / Respondent's notice of deficiency reflects unrepaid withdrawals during the 1970 calendar year of $107,105.23. Respondent has conceded that an addition error of $100 was made in his notice and acknowledges the correct amount to be $107,005.23.
[2]↩ / Mar. 31, 1971, if sold during fiscal year ended Mar. 31, 1972, and Mar. 31, 1970, if sold during fiscal year ended Mar. 31, 1971.
3. / The following table lists, for example, 14 items of machinery marked down as of Mar. 31, 1972, which were sold within a few months for prices far in excess of the newly assigned values: ↩ Stock No.
Markdown Value
Date of Sale
Sales Price
2049
$ 50.00
9/22/72
$ 2,700.00
2093
100.00
5/ 4/72
5,350.00
2107
100.00
7/17/72
5,000.00
2122
50.00
6/14/72
3,450.00
2208
4,500.00
5/25/71
14,950.00
2258
50.00
9/ 6/72
12,000.00
2264
10.00
8/29/72
1,950.00
2292
1,500.00
6/10/72
10,500.00
2307
50.00
5/16/72
2,650.00
2315
50.00
8/ 9/72
3,250.00
2623
50.00
6/22/72
4,500.00
2635
2,000.00
9/ 5/72
15,300.00
2638
2,000.00
7/31/72
14,500.00
2703
1,000.00
8/29/72
22,500.00